UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                   Plaintiff,

      v.

TRAVIOUS PARKER,

                 Defendant.
_____

<u>DECISION & ORDER and</u>
<u>REPORT & RECOMMENDATION</u>

02-CR-6091T

## **BACKGROUND**

By Order dated August 4, 2004, all pre-trial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 72).

Defendant Travious Parker ("Parker") is charged in a seven-count superseding indictment, three counts of which relate to events occurring on July 19, 2002, two counts of which relate to events of June 7, 2002, and the remaining two counts of which relate to events occurring between April 30 and May 1, 2002.  As to July 19, 2002, the first count charges that Parker unlawfully possessed a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1); the second count charges that Parker possessed with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and, the seventh count charges that Parker possessed a firearm after having been convicted of a crime punishable by a term of imprisonment exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). As to June 7, 2002, the third and fourth counts charge, respectively, that Parker possessed with intent to distribute cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and

possessed marijuana, in violation of 21 U.S.C. § 844(a).  As to the period between April 30 and

May 1, 2002, Counts Five and Six charge, respectively, that Parker possessed with intent to

distribute five grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and

841(b)(1)(B), and possessed in excess of five grams of cocaine base, in violation of 21 U.S.C.

§ 844(a).

Currently pending before this Court are Parker's motions to suppress tangible

evidence.[1]  (Docket # 90).  For the following reasons, it is the recommendation of this Court that

Parker's motions be denied.


## FACTUAL BACKGROUND

The original indictment in this case was filed against Parker on September 10,

2002.  (Docket # 6).  Shortly thereafter, Parker moved, *inter alia*, to suppress tangible evidence

seized pursuant to a stop and search of his person immediately preceding his arrest on July 19,

2002.  (Docket # 13).  An evidentiary hearing was held before former United States Magistrate

Judge William G. Bauer, who subsequently issued a written opinion recommending that Parker's

motion be denied.  (Docket # 26).  His recommendation was adopted by United States District

Judge Michael A. Telesca on April 14, 2003, over Parker's objection.  (Docket # 32).

On October 10, 2003, Parker moved to relieve his former counsel and requested

the appointment of new counsel.  (Docket # 48).  Judge Telesca granted his motion, and current

---

[1] Parker's omnibus motion relating to the superseding indictment also sought, *inter alia*, suppression of statements, discovery and inspection, *Brady* material, *Jencks* material, rulings on evidentiary matters under Rules 404, 608 and 609 of the Federal Rules of Evidence, the preservation of rough notes, the removal of sentencing allegations from the indictment and severance.  (Docket # 90).  Each of these requests was either resolved by the parties or decided in open court by the undersigned on February 18, 2005.  (Docket # 94).

counsel was assigned to represent Parker. (Docket # 56). On June 21, 2004, Parker moved to reopen the suppression hearing on the grounds that his former counsel improperly had prevented him from testifying. (Docket # 68). This Court held an evidentiary hearing on Parker's motions, after which it granted Parker's motion to reopen the suppression hearing in order to permit him to testify. (Docket # 82).

While that motion was pending, the grand jury returned a seven-count superseding indictment against Parker. (Docket # 79). Parker thereafter moved, *inter alia*, to suppress tangible evidence relating to the charges contained in the superseding indictment. (Docket # 90).

On March 7 and March 9, 2005, this Court conducted a suppression hearing on Parker's motions to suppress. (Docket ## 95, 97). The subject of the hearing was the events allegedly occurring on May 1, 2002, June 7, 2002, and July 19, 2002, which form the bases of the charges in the indictment. Specifically, Deputy Kevin Bubel of the Monroe County Sheriff's Department testified concerning evidence seized from Parker during the booking process following his arrest on May 1, 2002. Officer Herbert McClellan of the Rochester Police Department testified regarding a traffic stop and subsequent arrest and search of Parker occurring on June 7, 2002. Finally, pursuant to this Court's ruling, Parker testified concerning the events surrounding his arrest on July 19, 2002 – the subject of the evidentiary hearing that had been conducted before Magistrate Judge Bauer.

**Testimony Regarding Evidence Seized from Parker on May 1, 2002:** Deputy Sheriff Kevin Bubel testified concerning events occurring on May 1, 2002, which culminated in a strip search of Parker at the Monroe County Jail following his arrest on a misdemeanor charge.

(Tr.A 32).[2]  At the time of his testimony, Bubel was a Deputy Sheriff Jailer for the Monroe

County Sheriff's Department, which is responsible for all individuals detained in the Monroe

County Jail.  (Tr.A 35).  According to Bubel, an individual arrested by a city police officer may

be held in the jail until the following day at 9:30 a.m., the time scheduled for arraignments.

(Tr.A 35-36).  When the arrested individual arrives at the jail, his or her property is removed in

order to ensure prison safety and to safeguard the arrestee's property.  (Tr.A 36).  Property

removed during booking is itemized and placed in a property bag, and a receipt is provided to the

arrestee so that the property may be retrieved upon his or her release.  (Tr.A 37).  Prior to

arraignment, and while they are being held, arrested individuals are permitted to wear their own

clothing, except hats and gloves, as long as it is not deemed to pose a danger.  (Tr.A 37).

   Bubel further testified that arrestees brought to the jail on misdemeanor charges

are generally subjected to a pat-search and a non-invasive body scan for metal objects.  (Tr.A

38).  Certain of those arrestees may be subjected to a further strip search, Bubel testified, under a

variety of circumstances.  (Tr.A 39).  According to Bubel, that general authority is reflected in a

written policy statement, known as the General Order on Searches of Persons.  (Tr.A 39-40;

Government's Exhibit ("G. Ex.") 3).

   According to the General Order, which was admitted into evidence, three types of

searches of prisoners and unofficial visitors to the Monroe County Jail may be authorized

depending upon the circumstances: a pat search, a strip search and a body cavity search.  (G. Ex.

---

[2]  The transcript of the suppression hearing conducted before this Court on March 7, 2005, shall hereinafter
be referenced as "Tr.A __."  (Docket # 101).
 The transcript of the suppression hearing conducted before this Court on March 9, 2005, shall hereinafter
be referenced as "Tr.B __."  (Docket # 100).

3).  The expressed policy underlying each of these searches is "to detect and reduce the introduction of contraband and (weapons and/or drugs) into the jail facility, escapes and disturbances, and recover missing and stolen property."  (G. Ex. 3 at 1).  The Order provides that all inmates entering the jail shall be pat searched and scanned with a metal detector.  A pat search is defined as:

> a search where inmates are not required to disrobe, but will be required to remove all items from their pockets and turn their pockets inside out.  *Inmates will also be required to remove multiple layers of clothing, coats, hats, belts, etc.*

(*Id.* at 1-2) (emphasis added).

As for strip searches, the General Order states that they may be authorized "based upon the nature of the offense, prior jail history and current cell status."  (*Id.* at 2).  The Order also lists six other circumstances "which may prompt a strip search."  (*Id.*)  The third circumstance is "when the staff has reason to believe that the inmate is in possession of contraband."[3]  (*Id.*)  A prisoner's loose or baggy clothing is not mentioned as a justification for a strip search.  The purpose of a strip search is to minimize the risk from concealed contraband and to protect staff and other persons from harm.  (*Id.*)

Bubel also testified that he did not carry a copy of the General Order with him while he was on duty in the booking department.  (Tr.A 40).  Instead, he carried a pocket card summarizing the circumstances justifying a strip search.  That card was issued by the booking department supervisor to all deputies who worked in the department and was understood by Bubel to reflect the County's strip search policy.  (Tr.A 40, 60, 66).  The card delineated the

---

[3] Bubel testified that none of the six circumstances delineated applied to Parker when he was strip searched.  (Tr.A 59).

following six circumstances justifying a strip search of arrestees charged with misdemeanors or violations: nature of offense, prior jail history, circumstances of the arrest, characteristics of the prisoner, prisoner status and "clothing." (G. Ex. 4; Tr.A 43-44). The "clothing" justification provides that strip searches will be authorized when "loose fitting or bulky clothing makes it difficult to pat search." (G. Ex. 4).

   With respect to the circumstances of Parker's booking, Bubel testified that Parker had been arrested on a misdemeanor charge of false personation. As with all individuals charged with misdemeanor crimes, Parker was subjected to a non-invasive body scan. (Tr.A 38). Bubel testified that he also conducted a strip search of Parker. He recalled that he decided to perform the strip search either because Parker's clothing was too loose for a pat search or because he believed that Parker seemed nervous. (Tr.A 44). Bubel was unable to recall which circumstance occurred, but testified that he believed that the strip search was authorized by the County's policy as reflected in the summary card. (Tr.A 44, 61, 67-68).

   During a strip search, the arrestee is directed to remove his or her clothing, which is then searched by a deputy. (Tr.A 47-48). In this case, Bubel found a clear baggie of a white substance that he believed to be crack cocaine in the lining of the hood of Parker's sweatshirt. (Tr.A 48-49). No other contraband or property was found during the search. (Tr.A 60).

   Parker did not undergo a body cavity search. (Tr.A 47).


    **Testimony Regarding Evidence Seized from Parker on June 7, 2002:** Officer Herbert McClellan testified concerning a traffic stop of Parker's vehicle conducted on June 7, 2002. (Tr.A 4). On that date, McClellan was a member of a tactical unit assigned to conduct

"proactive police work" in the Genesee area.  (Tr.A 4).  McClellan testified that shortly after

midnight, he and his partner were traveling in their patrol vehicle northbound on Genesee Street,

near the intersection of Sawyer Street.  On the road ahead, he observed a white Ford Expedition

traveling in the same direction.  (Tr.A 4-5).  According to McClellan, the driver of the

Expedition then made a left-hand turn from Genesee Street without using his turn signal.  (Tr.A

6).  McClellan further testified that the vehicle was approximately two hundred feet in front of

him, and nothing obstructed his view.  (Tr.A 6-7).  McClellan and his partner followed the

Expedition onto Rosalind Street, where it pulled over to the curb.  McClellan drove his patrol

vehicle behind the Expedition and activated the emergency lights.  (Tr.A 8).

After making the traffic stop, McClellan approached the driver's side of the

Expedition and asked the driver whether he had a licence.  The driver identified himself as

Travious Parker and indicated that he had only a learner's permit.[4]  (Tr.A 8-9).  McClellan

testified that there was also a female passenger in the vehicle, whom he asked for a driver's

license.  The passenger replied that she did not have one.  (Tr.A 10).  As McClellan explained,

New York State law requires a driver with a learner's permit to be accompanied by a licensed

passenger.  (Tr.A 10).

McClellan further testified that as he spoke with Parker regarding his driving

privileges, he recognized the odor of burning marijuana emanating from the Expedition.  (Tr.A

10).  McClellan asked Parker to exit the vehicle, and as he did, McClellan observed a burnt

marijuana blunt on the floor of the driver's side of the vehicle.  A marijuana blunt, McClellan

---

[4] Officer McClellan testified that he could not recall whether the driver of the Expedition produced a New
York State learner's permit or only indicated that he had one.  (Tr.A 8-9).

testified, is a cigar with marijuana contained inside.  (Tr.A 11).  On the center console, he saw a plastic bag containing a green substance that he believed to be marijuana.  (Tr.A 12).

Following McClellan's observations, his partner confirmed that Parker's driver's license had been suspended.  (Tr.A 13).  McClellan then placed Parker in custody, handcuffed and searched him.  (Tr.A 15).  In Parker's front pants pocket, McClellan discovered a plastic bag, inside of which were four smaller ziplock baggies containing a white chunky substance, later confirmed to be crack cocaine.  (Tr.A 15-16; Tr.B 6).  McClellan testified that he turned over the suspected narcotics to Officer Dave Simpson.  (Tr.A 16).

McClellan testified that in addition to the cocaine found in Parker's pocket, he also observed a bag inside Parker's boot.  According to McClellan, Parker's boot was untied and loose-fitting, thus enabling McCellan to observe the bag without manipulating the boot.  (Tr.B 4-5).  McClellan reached into the boot and pulled out the bag, which contained a large white chunky substance that he believed to be crack cocaine.  (Tr.B 5).  After Parker was taken into custody, McClellan discovered a plastic cup in the center console of the Expedition that contained an alcoholic beverage.  (Tr.A 18).

McClellan issued four traffic citations following Parker's stop: the first, for failing to signal a left turn; the second, for having an open container of an alcoholic beverage in a motor vehicle; the third, for the unlicensed operation of a motor vehicle; and, the fourth, for aggravated unlicensed operation of a motor vehicle in the second degree.  (Tr.A 17-19).


**Testimony Regarding Parker's Arrest on July 19, 2002:**  During the original evidentiary hearing in this matter that occurred before Magistrate Judge Bauer, the government

offered the testimony of Officer David Simpson of the Rochester Police Department relating to the events preceding Parker's arrest on July 19, 2002.[5]  (Docket # 20).  Also testifying before Judge Bauer was a civilian witness, Zenobia Jones, who was called on behalf of the defense. (Docket # 21).  Their testimony, which this Court has read and considered, is summarized below.

**Testimony of Officer David Simpson:**  Officer Simpson testified that prior to July 19, 2002, he had encountered Parker on multiple occasions in the vicinity of Genesee and Sawyer Streets, an area known by Simpson to have a high incidence of narcotics activity.  (Tr.C 7-9, 63).[6]  Those encounters related to drug investigations, and one such encounter, which occurred approximately one month earlier, resulted in Parker's arrest for a narcotics offense.[7] (Tr.C 7-8).  On July 19, 2002, at approximately 12:25 a.m., Simpson and his partner, Dion Migloiratti, were on duty and received information relating to a report of a motor vehicle accident.  Specifically, Simpson learned that a two-car accident had occurred at the intersection of Genesee Street and Sawyer Street, and that a black male driver, approximately six-feet tall and wearing a red top, had fled the scene.  (Tr.C 10).

Simpson testified that when he heard the description of the male who had fled, he considered Parker a possible suspect because he fit the general description and because Simpson had observed him earlier in the day near that intersection wearing a red top.  (Tr.C 10-11). Simpson also testified that earlier that evening, he had received a call from a known confidential

---

[5]  The government also offered the testimony of United States Deputy Marshal Scott Hopkins for the sole purpose of demonstrating Parker's height.

[6]  The transcript of the suppression hearing conducted before Magistrate Judge Bauer on November 22, 2002, shall hereinafter be referenced as "Tr.C __."  (Docket # 20).

[7]  Although the record is not entirely clear, it appears that the earlier arrest was the arrest that McClellan testified occurred on June 7, 2002 following a traffic stop.  (*See* Tr.A 16).

informant regarding Parker.  (Tr.C 13-15).  The informant, who had provided reliable

information on multiple prior occasions, reported that Parker had been assaulted in a fight and

had been observed by the informant, just prior to the call, carrying a handgun.  (Tr.C 13, 15-16).

Because he was involved in another arrest when the accident report occurred,

Simpson did not report to the scene of the accident until approximately twenty minutes later.

(Tr.C 11).  While driving to the scene, Simpson observed Parker standing in front of 732

Genesee Street, approximately one block from the intersection with Sawyer Street.  (Tr.C 12).

Simpson advised the other officers present on the scene that Parker was nearby, that he fit the

description of the driver and that Simpson would be "stepping out" with them.  (Tr.C 11-12).

Simpson and Migloiratti then returned to 732 Genesee Street and exited the patrol

car.  Simpson testified that as they entered the gate at that address, he called out to Parker, who

was leaning on the fence.  (Tr.C 16).  Simpson testified that when Parker observed him, he

started to walk backwards towards the house.  (Tr.C 16, 18).  Parker's evasive behavior, Simpson

testified, was unusual.  On the fifteen to twenty prior occasions on which Simpson had contact

with Parker, this was the first time he ever had appeared evasive.  (Tr.C 26-27).

Simpson also testified that as he approached Parker, he noticed that Parker was

wearing a red sweatshirt with a bulge in the front stomach area.  (Tr.C 18, 20).  Parker's top was

tucked into his pants and the bulge seemed to be in the folds of his shirt, not in a pocket.  (Tr.C

64-65).  Parker's sweatshirt was sagging down.  As Simpson described, "It was weighted; it was

just very distinct."  (Tr.C 18).  Simpson continued to approach Parker and began to speak to him

about the accident, all the while focusing his attention on the object that he believed to be a gun.

(Tr.C 19-20).  When he reached Parker, Simpson took hold of Parker's left arm and grabbed for

10

the object from the outside of Parker's sweatshirt.  (Tr.C 20).  Upon touching it, Simpson

recognized that it was a firearm.  (Tr.C 22).  Simpson kept hold of the gun and ordered Parker to

the ground, an order with which Parker "reasonably complied," according to Simpson.  (Tr.C

22).  With Miglioratti's assistance, Simpson handcuffed him and thereafter recovered a fully-

loaded .357 Ruger handgun from the sweatshirt.  (Tr.C 23-24).  Following Parker's arrest, the

officers recovered thirty dime bags of crack cocaine and $51 in cash from Parker's pockets.

(Tr.C 24-25).

        **Testimony of Zenobia Jones:**  Ms. Jones testified that she resides at 732 Genesee

Street.  (Tr.D 4).[8]  On July 19, 2002, between the time of 12:00 a.m. and 2:00 a.m., Jones

observed a motor vehicle accident near the intersection of Genesee and Sawyer Streets.  (Tr.D 4-

5).  Jones was standing with her neighbor, Kwalinda Felder, in front of her house at the time of

the accident.  (Tr.D 5, 25).  According to Jones, Parker was across the street at that time.  (Tr.D

5).  Jones further testified that she observed the driver of one of the cars flee, and that he was

approximately six-feet tall and was wearing a red t-shirt and dark pants.  (Tr.D 7).  Jones left her

house and went to the scene of the accident, where she spoke with a uniformed police officer

about her observations.  (Tr.D 8-9).  While speaking to the officer, she continued to see Parker

across the street, who appeared to be observing the accident scene.  (Tr.D 9-11).

        Jones subsequently returned to her residence and was visited by Parker

approximately one-half hour later.  He was wearing a "baggy" red outfit that bore the initials

---

[8] The transcript of the suppression hearing conducted before Magistrate Judge Bauer on December 17,
2002, shall hereinafter be referenced as "Tr.D __."  (Docket # 21).

"RL" and a gray sweatjacket.  (Tr.D 11, 18-19).  At the time, Jones had known Parker for approximately one year and considered him a friend.  (Tr.D 13).

Specifically, Jones testified that as she was sitting on her front porch with Felder, Parker entered her yard, approached her and spoke to her as he stood at the bottom of her porch steps, leaning against the bannister.  After talking with Parker for approximately twenty minutes, Jones testified, a police car pulled up in front of her house, and two officers got out.  (Tr.D 15). Jones recognized one of the officers as Simpson, stating that she had seen him on prior occasions arresting individuals on her block.  (Tr.D 16).  She thought he "harrasse[d]" people because, in her view, he would stop people walking down the street for no reason and "check them," which Jones felt was not right.  (Tr.D 28).

Simpson and his partner entered her yard, and Jones overheard Simpson say to his partner, "Doesn't this look like the person we're looking for?"  Believing that Simpson was referring to the accident, Jones responded, "No," hoping to prevent the officers from arresting the wrong person.  (Tr.D 17).  Before Parker said anything, Simpson "checked" him, prompting Parker to respond that the officers had no reason to check him.  (Tr.D 18).  Jones testified that she did not observe Parker move away as Simpson approached him (Tr.D 22) and "the next thing [she] kn[e]w," the police had contact with Parker – which occurred "fairly quickly" – resulting in their recovery of a gun from Parker.  (Tr.D 45).  According to Jones, she had not observed anything up to that point to lead her to believe that Parker had a gun.  (Tr.D 20).  Jones testified that during the officers' encounter with Parker, she yelled to them that they had the wrong person; Simpson replied that she "should be congratulating them for getting people like [Parker] off the streets."  (Tr.D 21).

**Testimony of Travious Parker:**  Pursuant to this Court's prior order, on March 9, 2005, Parker testified concerning his arrest on July 19, 2002.  He testified that while he was at a friend's house that night, he observed a motor vehicle accident at the intersection of Genesee Street and Sawyer Street.  (Tr.B 12).  Parker testified that he walked towards the site of the accident and observed a male wearing a red shirt and dark jeans exit one of the vehicles and run away.  (Tr.B 37).  Parker also observed the other driver walking in the street, whom he assisted to the side of the road.  (Tr.B 13).  Parker then walked towards the intersection of Genesee Street and Cottage Street, where he stopped to interact with an acquaintance, Zenobia Jones, at her residence.  (Tr.B 13-14).  Parker testified that he walked up to Jones's front porch and leaned on her railing as he spoke with her about the accident.  (Tr.B 14).  Parker further testified that he was wearing a red sweatsuit with the initials "R.W." on it and a gray, zip-up hooded jacket, which bore the insignia "Mecca."  (Tr.B 17).

While speaking with Jones, Parker heard someone behind him say something about the accident.  Parker turned and observed two police officers entering the yard, one of whom he recognized as David Simpson.  (Tr.B 15-16).  According to Parker, Simpson asked, "Oh, Squirt,[9] did you see anything with the accident?  That wasn't you, was it?"  (Tr.B 16).  Parker responded that he did not know what Simpson was talking about.  Simpson then grabbed Parker's left arm and asked whether it was him or whether he had seen anything.  Parker again responded that he had not.  During the conversation, Parker attempted to free his arm and told Simpson to let him go, prompting Simpson to warn Parker to stop resisting arrest.  Parker

---

[9] "Squirt" was a nickname used by Parker.  (Tr.B 16; Tr.C 37; Tr.D 26).

replied, "resisting arrest for what, I didn't do anything."  According to Parker, Simpson did not

respond.  (Tr.B 20).

          Parker testified that during this conversation, he overheard Simpson broadcast

over his police radio that he needed assistance because he had a possible suspect from the motor

vehicle accident.  Simpson was still holding Parker's right arm, which Parker tried to free.  As he

attempted to loosen Simpson's grip, another officer took hold of his right arm.  Parker continued

to struggle, during which time he observed another police car arrive on the scene.  (Tr.B 20-21).

During the struggle, the officers brought Parker to the ground.  Specifically, Parker testified that

he was lying face down with his hands beneath his chest.  (Tr.B 21).  Parker further testified that

during the struggle, while two or three officers were on top of him holding his arms and kneeling

on his neck and back, he tried to remove a .357 handgun from his waistband, testifying, "I was

trying to get it off me, so that I'm not caught with it."  (Tr.B 23).  As he attempted to remove the

weapon, it became caught in the front portion of his sweatshirt.  (Tr.B 23-24).  The officers then

brought Parker to his feet, and Simpson lifted Parker's shirt and recovered the weapon.  (Tr.B

24).  Parker asked why he was being arrested, and Simpson replied, "For this," referring to the

handgun.  (Tr.B 24).  Parker replied, "I'm going to beat it because I didn't do anything and you

were messing with me for no reason, so I'm going to beat it when I go to court."  According to

Parker, Simpson responded, "Tell it to the judge.  I finally got you and you're going to get five to

fifteen for this one."  (Tr.B 24).

## DISCUSSION

Before this Court are motions to suppress evidence seized on three separate occasions.  First, Parker moves to suppress tangible evidence seized at the Monroe County Public Safety Building following his arrest on May 1, 2002.  Second, Parker moves to suppress evidence seized following a traffic stop and his arrest on June 7, 2002.  Finally, Parker moves to suppress evidence seized at the time of his arrest at 732 Genesee Street on July 19, 2002.  (Docket ## 90, 102).

## I.  Evidence Seized on May 1, 2002

Parker moves to suppress the narcotics discovered in his sweatshirt by Deputy Bubel during a strip search at the Monroe County Jail.  Parker argues that because he had only been charged with false personation, a misdemeanor, the strip search that was performed on him was unreasonable under the Fourth Amendment to the United States Constitution.  (Docket # 102).  He further contends that the narcotics that were discovered during the search of his sweatshirt should be suppressed.

**A.  Applicable Law:**  The Fourth Amendment prohibits unreasonable searches and seizures.  To be reasonable, searches generally must be conducted pursuant to a warrant, although there are well-recognized exceptions to this general rule, including an exception for inventory searches performed when an individual, lawfully arrested, is brought to the police station or jail and "booked."  *See Illinois v. Lafayette*, 462 U.S. 640, 643 (1983); *South Dakota v. Opperman*, 428 U.S. 364, 367-76 (1976).  As the Supreme Court has acknowledged, "[t]he governmental interests underlying a stationhouse search of the arrestee's person and possessions

may in some circumstances be even greater than those supporting a search immediately following

arrest." *Illinois v. Lafayette*, 462 U.S. at 645.  Those interests generally include "[1] . . .

protect[ing] an owner's property while it is in the custody of the police, [2] . . . insur[ing] against

claims of lost, stolen, or vandalized property, and . . . [3] . . . guard[ing] the police from danger."

*Colorado v. Bertine*, 479 U.S. 367, 371-72 (1987).  These "important and legitimate

governmental interests" justify a booking search of "every item carried on or by a person who has

lawfully been taken into custody." *Illinois v. Lafayette*, 462 U.S. at 648.  Of course, a booking

search, like any other inventory search, must be conducted pursuant to standardized procedures

or established routines. *See id.*; *Florida v. Wells*, 495 U.S. 1, 4-5 (1990); *United States v.*

*Griffiths*, 47 F.3d 74, 78 (2d Cir. 1995).

        Inventory searches are not without bounds.  Indeed, as the Second Circuit has

recognized, while strip searches may constitute permissible booking searches, the "intrusive and

demeaning" character of such searches mandates that they be supported by "particularized

suspicion." *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986) (citing *United States v. Montoya De*

*Hernandez*, 473 U.S. 531, 540 (1985)), *cert. denied*, 483 U.S. 1020 (1987).  In *Weber*, the

Second Circuit determined that the policy of the Monroe County Jail – the same jail where

Parker was booked – to search all misdemeanor arrestees was unconstitutional.  In so holding, the

court declared, "the Fourth Amendment precludes prison officials from performing strip [or]

body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the

[searching] officials have a reasonable suspicion that the arrestee is concealing weapons or other

contraband based on the crime charged, the particular characteristics of the arrestee, and/or the

circumstances of the arrest." *Id.* at 802.  That holding has been reaffirmed and remains

16

controlling authority in the Second Circuit.[10]  *See Shain v. Ellison*, 273 F.3d 56, 66 (2d Cir. 2001), *cert. denied*, 537 U.S. 1083 (2002); *Walsh v. Franco*, 849 F.2d 66, 69 (2d Cir. 1988).

B.  **Bubel's Search of Parker:**  Bubel plainly had difficulty remembering the circumstances of his search of Parker – a search that had occurred nearly three years prior to his testimony.  He recalled that during the search he had discovered narcotics in the hood of Parker's jacket.  He had an independent recollection of this discovery because, as he explained, "very rarely in jail do you find substantial amounts of suspected drugs on somebody."  (Tr.A 51).  He also testified that he remembered Parker, whom he identified during the hearing (Tr.A 50), and recalled that he had been arrested on a misdemeanor charge of false personation (Tr.A 34, 56).  Bubel conceded that his testimony that Parker had a jacket or hooded sweatshirt was based upon his review of a written report dated the same day as his search of Parker.  (Tr.A 44).  He could not, however, recall whether Parker was wearing the jacket, or whether he had already removed it before Bubel first encountered him.  (Tr.A 63).

Bubel candidly admitted that he could not remember who assisted him with the strip search (Tr.A 52), nor could he remember the precise circumstances that led him to determine that a strip search was warranted.  His best recollection was that his decision was based either upon his belief that Parker was acting nervously or based upon the fact that Parker was wearing loose clothing that interfered with his ability to conduct an effective pat search.

---

[10]  The dissenting opinion in *Shain v. Ellison* argues that the "reasonable suspicion" standard has been supplanted by the "reasonably related to legitimate penological interests" standard articulated by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 89-90 (1987).  *Shain v. Ellison*, 273 F.3d 56, 70-76 (2d Cir. 2001), *cert. denied*, 537 U.S. 1083 (2002).  That opinion remains the minority view at this time.

(Tr.A 44).  Significantly, he could not recall upon which of the purported justifications he had relied.  (Tr.A 55).

Moreover, Bubel could not recall clearly the sequence of the search, namely, whether Parker's jacket was searched first, followed by a strip search of his body, or the reverse. On the one hand, Bubel offered testimony suggesting that his decision to conduct the strip search was based upon his discovery of contraband in Parker's jacket:

> Q:    So we're clear, the discovery of the drugs in the lining of the hood of the sweatshirt was after you conducted the strip search, correct?
>
> A:    No, the sweatshirt would have been in his hands.  After finding the contraband, it moved into the strip search.
>
> Q:    I want to go back.  In this case you were not conducting a strip search of Mr. Parker when you found the drugs?
>
> A:    If he had a jacket, I would have taken custody of the jacket and upon searching the jacket, it would have been a strip search after finding something or based on behavior coming in.

(Tr.A 54).  In sharp contrast with this testimony, however, Bubel also testified that he could not remember whether he discovered the contraband in Parker's jacket before or after Parker was naked.  (Tr.A 65).

Bubel's failure of recall, however understandable, bears on the lawfulness of his strip search of Parker.  Had Bubel conducted the strip search only after discovering the narcotics that Parker had concealed in his jacket, that subsequent search would have been supported by reasonable suspicion and thus proper.  Conversely, had the strip search preceded the discovery of the contraband, its lawfulness would depend upon the adequacy of the two justifications Bubel

18

offered – Parker's alleged nervous behavior in the jail and his baggy clothing.  Because Bubel

could not recall when the search occurred or upon which of the justifications he relied, this Court

must assume that the search occurred prior to the discovery of the narcotics and that it was

initiated either because of Parker's behavior or his baggy clothing, but not because of both.

Applying controlling Second Circuit authority, I find that the first of Bubel's

purported justifications (nervous behavior) may be adequate, while the latter (baggy clothing)

likely is not.  Had Bubel been able to testify convincingly that Parker acted in a nervous and

evasive matter, this Court may well have concluded that Bubel had reasonable suspicion that

Parker was concealing contraband and that the strip search was constitutional.  On the other

hand, had Bubel testified that the strip search was based solely on the fact that Parker was

wearing baggy clothing, this Court may well have concluded that reasonable suspicion was

wanting.[11]  *See United States v. Asbury*, 586 F.2d 973, 977 (2d Cir. 1978) (noting that "loose

fitting or bulky clothing" may be factor which, combined with other factors, justifies a border

strip search).  While there may be circumstances in which the unique characteristics of an

arrestee's baggy clothing lead to the reasonable suspicion that the arrestee is concealing

contraband, *see United States v. Diaz*, 503 F.2d 1025, 1026 n.1 (3d Cir. 1974) (border strip

search justified by, *inter alia*, "the fact that [the] [defendant's] upper chest appeared overly large

or bulky for a woman of her size and shape"), Bubel did not testify about any unique

characteristics of Parker's clothing.

---

[11]  Although Bubel testified that he knew that Parker had been arrested for false personation, he did not testify that this fact figured into his decision to search Parker.  (*See* Tr.A 44, 55).

In other words, I am constrained by the record before me to conclude that the government has not demonstrated that Parker's strip search was constitutional.[12]  That finding does not, however, lead me to believe that suppression of the narcotics is mandated.  Rather, Bubel's testimony persuades me that he was justified in searching Parker's jacket, even if that search were based solely on the jacket's loose-fitting nature, whether or not a full strip search was justified.

Bubel explained that his search of Parker was conducted for two reasons: to ensure the safety of the facility and to safeguard Parker's property during his period of detention. (Tr.A 36).  Those interests lie at the heart of all booking searches and justify such searches as reasonable under the Fourth Amendment.  *See Illinois v. Lafayette*, 462 U.S. at 648.  Moreover, a booking search, where conducted in accordance with standardized policies or procedures, may include the removal of outer clothing to facilitate the search, *id.* (a lawful booking search encompasses "every item carried on or by a person who has lawfully been taken into custody); *see also United States v. Edwards*, 415 U.S. 800, 803-04 (1974), ("[n]or is there any doubt that clothing or other belongings may be seized upon arrival of the accused at the place of detention"); the importance of the interests served by such a search amply outweighs the almost non-existent intrusion attendant to the removal of outer clothing.  Indeed, in this case, Monroe County's Order applicable to booking searches authorized exactly such a search.  As the Order provided, arrestees must "remove multiple layers of clothing, coats, hats, belts, etc." as part of the routine, booking  pat-search conducted on all arrestees  (G. Ex. B at 1-2).

---

[12]  This statement is not intended to imply that I find that the strip search was in fact unconstitutional.

20

In this case, because I find (1) that Bubel was authorized by County policy to require Parker to remove his jacket to facilitate a pat-search and (2) that such a search was not unreasonable under the Fourth Amendment, I conclude that the search of Parker's jacket was constitutional and that the suppression of the narcotics recovered from the jacket is not warranted.  The remainder of the search, which included a full strip search, may or may not have been constitutional at the time it was conducted (considering Bubel's hazy memory, such a determination is difficult to make and, in any event, unnecessary to a resolution of the issues before me).  Even if it were unconstitutional, it did not result in the discovery of any evidence, and I thus recommend denial of Parker's suppression motion.

## II.  Evidence Seized on June 7, 2002

Parker also moves to suppress tangible evidence seized from his person and vehicle pursuant to the traffic stop by Officer McClellan on June 7, 2002.  (Docket # 90).  To analyze Parker's claim, this Court must first determine whether the initial traffic stop by McClellan was justified.  If so, it must then determine whether the evidence was rightfully seized.

A.  **Traffic Stop:**  As the Second Circuit has observed, an ordinary traffic stop constitutes a limited seizure within the meaning of the Fourth Amendment.  *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir.) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)), *cert. denied*, 513 U.S. 877 (1994).  A traffic stop must be justified by probable cause or "reasonable suspicion, based on specific and articulable facts, of unlawful conduct."  *Id.* (quoting *United States v. Hassan El*, 5 F.3d 726, 729 (4th Cir. 1993), *cert. denied*, 511 U.S. 1006 (1994)); *see*

*Terry v. Ohio*, 392 U.S. 1, 30 (1968) (police officer may lawfully conduct brief stop and frisk for weapons, without probable cause, if officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot"); *see also Knowles v. Iowa*, 525 U.S. 113, 117 (1998) (routine traffic stop is more analogous to *Terry* stop than to formal arrest).  Evidence obtained as the result of an unjustified traffic stop "is subject to the fruit of the poisonous tree doctrine" and may be suppressed.  *Scopo*, 19 F.3d at 781 (citing *Hassan El*, 5 F.3d at 729); *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure.  *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.1980) (citations omitted), *cert. denied*, 450 U.S. 917 (1981); *United States v. Chavis,* 48 F.3d 871, 872 (5th Cir.1995); *United States v. Bayless*, 921 F. Supp. 211, 213 (S.D.N.Y. 1996).  Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, *id.* at 213, that the search or seizure did not violate the Fourth Amendment.  *Arboleda*, 633 F.2d at 989; *see also United States v. Bonilla Romero*, 836 F.2d 39, 45 (1st Cir. 1987) ("[w]hen it has acted without a warrant, the ultimate burden of persuasion is then upon the government to show that its evidence is not tainted") (citing *Alderman v. United States*, 394 U.S. 165, 183 (1969)), *cert. denied*, 488 U.S. 817 (1988).

Here, Officer McClellan conducted a traffic stop of Parker's vehicle, and the government thus bears the burden of establishing that probable cause or reasonable suspicion existed to make the stop.  I find that this burden has been satisfied.

Officer McClellan testified that on June 7, 2002, while traveling on Genesee Street, he observed a white Ford Expedition make a left-hand turn without using its turn signal. (Tr.A 4-6).  This fact alone established probable cause for the traffic stop.  *See*, *e.g.*, *Whren v. United States*, 517 U.S. 806, 809-10 (1996) ("the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred"); *United States v. Harrell*, 268 F.3d 141, 148-49 (2d Cir. 2001) (officer's observations that car had defective brake light and impermissibly tinted windows justified traffic stop); *United States v. Dhinsa*, 171 F.3d 721, 725 (2d Cir. 1998) (vehicle's failure to signal lane change sufficient justification for traffic stop); *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir.) ("[w]hen an officer observes a traffic offense – however minor– he has probable cause to stop the driver of the vehicle") (internal quotation omitted), *cert. denied*, 513 U.S. 877 (1994); *United States v. Fernandez-Jimenez*, 2004 WL 1598653, *3 (S.D.N.Y. 2004) (officers' observation that vehicle turned without using turn signal justified traffic stop); *see also* N.Y. Veh. & Traf. Law § 1163 (McKinney 2005) ("no person shall turn a vehicle at an intersection . . . without giving an appropriate signal").  Accordingly, I conclude that the government has established probable cause to support the June 7, 2002 traffic stop.

**B.  <u>Seizure of Evidence</u>:**  Having concluded that McClellan's traffic stop of Parker was justified, this Court also must evaluate the seizure of evidence from the vehicle and from Parker's person.  Parker argues that the suppression of such evidence is warranted because the search was conducted without a warrant, consent or probable cause.  (Docket # 90).  This Court disagrees.  To the contrary, I find that the narcotics seized from Parker's vehicle are

admissible under the "plain view" exception to the Fourth Amendment and that the narcotics on

Parker's person were seized pursuant to a valid search incident to his arrest.

The plain view doctrine "authorizes seizure of illegal or evidentiary items visible

to a police officer whose access has some prior Fourth Amendment justification and who has

probable cause to suspect that the item is connected with criminal activity." *Illinois v. Andreas,*

463 U.S. 765, 771 (1983). The United States Supreme Court has articulated a three-part test to

determine whether evidence found in plain view should be admissible. First, the officer must

have had a legitimate right to be in the location from which the object was plainly viewed.

Second, the item's incriminating character must have been immediately apparent. Finally, the

officer must have had lawful access to the object. *Horton v. California*, 496 U.S. 128, 136-37

(1990); *see Texas v. Brown*, 460 U.S. 730, 740 (1983) ("There is no legitimate expectation of

privacy . . . shielding that portion of the interior of an automobile which may be viewed from

outside the vehicle by either inquisitive passersby or diligent police officers").

Here, McClellan had a legitimate right to view Parker's vehicle based upon the

appropriateness of the traffic stop, as set forth above. McClellan further testified that as he was

speaking with Parker concerning his driving privileges, he recognized the odor of burning

marijuana. (Tr.A 10). McClellan requested that Parker exit his vehicle; as he did, a burnt

marijuana blunt became visible on the floor of the driver's side. McClellan also observed a clear

plastic bag containing a green substance, which he believed to be marijuana, on the center

console of the vehicle. As McClellan testified, based upon his law enforcement experience, the

incriminating character of the narcotics was immediately apparent to him. Specifically, he

testified that he had observed marijuana blunts a minimum of one hundred times and was able to

distinguish the blunt from a normal cigar because it was "much thinner."  (Tr.A 11-12).  Thus, because the narcotics were in plain view, neither their observation, nor their warrantless seizure justifies suppression.  *See United States v. Graham*, 119 F. Supp. 2d 116, 126 (D. Conn. 2000) (finding that warrantless seizure of narcotics observed in plain view during routine traffic stop did not constitute invasion of privacy warranting suppression) (citing *Horton v. California*, 496 U.S. at 133, 141).

Finally, McClellan testified that after seizing the narcotics from the vehicle and confirming that Parker's driver's license had been suspended, he placed Parker in custody and handcuffed him.  (Tr.A 13, 15).  A search of Parker's person was then performed.  During such search, McClellan discovered a large plastic bag containing smaller baggies of crack cocaine in Parker's pants pocket, as well as an additional bag of crack cocaine in Parker's boot.  (Tr.A 15-16, Tr.B 4-5).  On this record, I find that the marijuana blunt observed in the vehicle driven by Parker created probable cause for his arrest and the narcotics recovered from Parker's person were properly seized pursuant to a search incident to that arrest.  *See United States v. Baratta*, 397 F.2d 215, 223 (2d Cir. 1968) ("a search incident to [] a lawful arrest may be properly carried out without a search warrant") (citations omitted); *see Maryland v. Buie*, 494 U.S. 325 (1990); *New York v. Belton*, 453 U.S. 454 (1981); *Chimel v. California*, 395 U.S. 752 (1969).

Thus, this Court recommends denial of Parker's motion to suppress evidence seized following the June 7, 2002 traffic stop and search of his vehicle and person.

### III.   <u>Evidence Seized on July 19, 2002</u>

Parker moves to suppress the evidence seized from his person on July 19, 2002. As stated above, Magistrate Judge Bauer previously considered Parker's motion and recommended that it be denied based upon the testimony of Officer Simpson and civilian witness Zenobia Jones.  (Docket # 26).  That recommendation was adopted by the District Court over Parker's objection.  (Docket # 32).  Subsequently, represented by new counsel, Parker claimed that his prior attorney had provided ineffective assistance by refusing to allow him to testify at the suppression hearing, and he moved to reopen the hearing so that he could testify.  Following a hearing before this Court on September 20, 2004, at which Parker's prior counsel testified, this Court granted Parker's motion.  Pursuant to that decision, Parker testified on March 9, 2005, concerning the events leading up to his arrest on July 19, 2002.

### A.   <u>Consideration of Parker's Testimony</u>:  Parker argues that his testimony is more credible than that offered by Simpson and that this Court thus should "reject the testimony of Officer Simpson, accredit the testimony of [Parker] and recommend the suppression of the firearm that was allegedly taken from [Parker] on July 19, 2002."  (Docket # 105).  Having carefully read and considered the testimony presented during the earlier suppression hearing, and having considered the testimony now offered by Parker, I disagree.

Officer Simpson and Parker offer substantially different accounts of the events preceding Parker's arrest.  Simpson testified that he approached Parker to question him about the accident after learning that one of the drivers had fled the scene of the accident and that the driver fit Parker's general description and, like Parker, was wearing a red shirt.  As Simpson approached him, Parker began moving backwards.  Simpson further testified that he observed a

noticeable bulge in the front stomach area of Parker's sweatshirt.  The bulge caused the

sweatshirt to sag down and was "very distinct."  Believing that the bulge was possibly a firearm,

particularly in view of the information that he had learned from an informant several hours

earlier that Parker was carrying a gun, Simpson used one hand to take hold of Parker's arm and

the other to grab the object through Parker's sweatshirt.  Upon touching the object, Simpson

confirmed that it was a firearm, and ordered Parker to the ground.

Parker, on the other hand, testified that while he was in Jones's front yard, he was

approached by Simpson and another officer.  According to Parker, Simpson immediately grabbed

his left arm and asked whether he had anything to do with a motor vehicle accident.  Without

cause or provocation, according to Parker, the two officers then wrestled him to the ground and

were joined in the struggle by a third officer.  Two of the officers wrestled to gain control of his

arms, and the third, a large officer weighing over 200 pounds, knelt on Parker's neck and back.

During this struggle, Parker testified that he tried to remove a firearm from his waistband so that

it would not be discovered on his person.  The weapon, however, became caught in the front

portion of his sweatshirt, where it was recovered by Simpson.

Notably, Zenobia Jones, a witness called by the defense, offered testimony that I

find generally more consistent in material respects with Simpson's version.  Specifically, she

testified that while she was speaking with Parker at her residence, Officer Simpson arrived with

another officer.  According to Jones, Parker was standing at the bottom of her porch steps, and

Simpson approached him, asked whether Parker was the person they were looking for, and

"checked" him.  She testified that the contact happened "fairly quickly," resulting in the officers'

recovery of a gun from Parker.  She did not testify that she observed a physical struggle take

place between Parker and three officers, as the defendant testified.  The fact that her testimony substantially corroborates Simpson's testimony[13] is significant considering her apparent disdain for Simpson and his interactions with residents of her neighborhood.  Considering this testimony, and her friendship with Parker, Jones had no detectable incentive to offer testimony more favorable to Simpson than to Parker.

In addition to the inconsistency between Parker's and Jones's testimony, I find further reason to reject Parker's version of events based upon the strained and illogical character of his testimony as a whole.  Parker testified that during his encounter with Simpson, three officers wrestled him to the ground and attempted to pull his hands behind his back so that they could handcuff him.  According to Parker, two of the officers held his arms as the third officer held a knee in Parker's back.  During this struggle, Parker testified, he attempted to reach into his waistband and remove a loaded handgun, so that it would not be on his person at the time of arrest.  Parker claims that he was not planning to use the weapon against the officers, but just wanted to discard the weapon on the ground underneath him.  Acknowledging that he would have been unable to throw the firearm, he stated that he tried to remove it because he believed he had "a better chance of beating [the charge] at trial if it wasn't on [him].  (Tr.B 50).  Parker further testified that he was unable to remove the gun because it got caught in the front fold of his sweatshirt – the same place Simpson testified that he observed the weapon upon first contacting Parker.

---

[13]  She did testify, as Parker also did later, that she did not see him retreat when Simpson approached. (Tr.D 22).

I find Parker's contentions to be so implausible as to defy credulity.  First, I do not believe that Parker would attempt to retrieve a loaded weapon from his possession, without intending to use it, during the midst of a close physical struggle with three armed officers; the risk that Parker could have been shot or killed by the officers is simply too great to believe that he would have acted as he claimed.  In addition, I find the likelihood that Parker would have been able to access and remove a firearm from his waistband while being restrained by three officers, and that any of the three officers would not have realized that Parker was trying to retrieve a weapon from under his clothing, too remote to credit.

I find that Parker's testimony relating to his possession of narcotics that night is similarly unpersuasive.  Parker testified that he was not selling narcotics on July 19, 2002, but was "hanging around" waiting for friends so that they could go to a bar and "try and pick up girls."  (Tr.B 26).  Upon further questioning, however, Parker admitted that at the time of his arrest, he possessed thirty or thirty-one bags of crack cocaine and two dime bags of marijuana. (Tr.B 26, 31-32).  Parker also stated that he had purchased the crack cocaine "in bulk" from an individual named "Woody" and that all of the narcotics were for his personal use.  (Tr.B 26-28). Parker testified that he planned to use the one cigar in his possession to smoke one of the bags of marijuana "and however many bags of crack . . . [he] could for making a blunt right."  (Tr.B 32). Moreover, despite Parker's repeated assertions that he was not a narcotics dealer, he admitted that he has a prior felony conviction for the attempted sale of narcotics.  (Tr.B 33).  Considering his record and his possession of thirty individual packages of crack cocaine, I find incredible Parker's contention that he purchased a bulk quantity of narcotics purely for personal use.

On this record, I cannot credit Parker's testimony over that originally offered by Simpson.  I thus reject Parker's testimony to the extent it is conflicting.

B. **Motion to Re-Open Cross-Examination of Simpson:**  Parker also has moved to reopen the cross-examination of Officer Simpson for the limited purpose of questioning him about inconsistencies between his testimony and a certified CAD print-out from the Rochester Police Department's Emergency Communications relating to the incident on July 19, 2002, which was offered into evidence.[14]  As counsel explained on the record, the CAD print-out includes an entry indicating that Simpson was assisting the officers at the scene of the motor vehicle accident.  Three minutes later, the CAD print-out reflects that Parker was in custody and a handgun was recovered.[15]  Parker argues that Simpson's cross-examination should be reopened because Parker's prior counsel provided ineffective assistance by failing to cross-examine Simpson about the CAD print-out.  (Tr.B 61).  I disagree and deny Parker's motion.

Parker argues that these entries are inconsistent with Simpson's testimony because (1) the CAD print-out does not reveal a call by Simpson to his dispatcher that he was "stepping out" with Parker and (2) it reveals an entry that Simpson informed the dispatcher that he was assisting on-scene with a "possible male for motor vehicle accident."  (*See* Docket # 105 and Tr.B 58-59).  Contrary to Parker's contention, I see no discrepancy between the CAD print-out and Simpson's testimony.

---

[14]  Neither party contends that this Court should completely reopen the suppression hearing to require Simpson and Jones to testify again, other than to require Simpson to be cross-examined for the limited purpose described above.

[15]  Parker also has submitted a letter *in camera* with regard to his request for further cross-examination of Simpson, which this Court has reviewed and considered.  (*See* Docket # 106 (sealed entry)).

30

A careful reading of Simpson's testimony reveals that he testified that he advised the on-scene officers in person that he was "stepping out" and that they should keep the radio frequency free in case Parker ran.  (Tr.C 11-12).  As Simpson explained, none of the officers at the scene were looking for the suspect and, "that's why I went to the scene.  I asked them if someone had.  They said no, and I said, 'Well, I'm going to step out with this person over here.'" (Tr.C 62).  My review of Simpson's testimony does not reveal any testimony amounting to an assertion that he radioed the dispatcher that he was "stepping out."  To the extent that he did inform the dispatcher that he was assisting with a possible suspect from the accident, I find that entry consistent with his testimony.  Simpson testified that as soon as he heard a description of the driver who fled, he considered Parker a suspect and intended to question him.  Moreover, the presence of the entry that he discovered the gun a few minutes later does not appear to conflict with Simpson's version of events.

To establish a claim for the ineffective assistance of counsel, a defendant must first demonstrate that counsel's representation "fell below the prevailing professional norms with a showing sufficient to overcome a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  *United States v. Vegas*, 27 F.3d 773, 777 (2d Cir.) (quoting *Strickland v. Washington*, 466 U.S. 668, 689 (1984)), *cert. denied*, 513 U.S. 911 (1994).  Even if such a showing is made, a "defendant must also demonstrate a reasonable probability that absent counsel's unprofessional performance, the outcome of the proceeding would have been different."  *United States v. Vegas*, 27 F.3d at 777 (citing *Strickland v. Washington*, 466 U.S. at 687-688, 693-94).  Applying this standard, the Second Circuit has recognized that "actions or omissions that 'might be considered sound [] strategy' do not

31

constitute ineffective assistance." *United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir.) (quoting

*Strickland v. Washington*, 466 U.S. at 689) (internal quotations omitted), *cert. denied*, 528 U.S.

849 (1999).  *See Colon v. Keane*, 1992 WL 135032, *6 (E.D.N.Y. 1992) (counsel's tactical

decisions relating to which witnesses to call generally do not amount to ineffective assistance)

(citing *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.), *cert. denied*, 484 U.S. 957

(1987)).

       In this case, defendant's prior counsel filed appropriate motions and submitted a

thorough memorandum of law.  Furthermore, my review of the original suppression hearing

transcript reveals that counsel appeared adequately prepared to cross-examine the government's

witnesses and to elicit the testimony of a witness called on behalf of the defense.  Indeed, the

record establishes that counsel's representation was both vigorous and thorough.  These findings

are inconsistent with a claim of ineffective assistance.  *See United States v. Aguirre*, 912 F.2d

555, 561 (2d Cir. 1990) (a general demonstration of preparation and competence carries

significant weight in evaluating whether counsel provided effective assistance).  In addition, for

the reasons stated *supra*, I also find that the relevance of the suggested cross-examination was

attenuated at best and had no material bearing on the legal issues before this Court.  Accordingly,

I deny Parker's motion to reopen the suppression hearing for the purpose of conducting further

cross-examination of Simpson.

       **C.  <u>Court's Previous Holding Should Not Be Disturbed</u>:**  In moving to reopen

the original suppression hearing in this matter, Parker essentially argues that consideration of his

testimony, which was not previously available, compels the granting of his original motion to

suppress evidence seized from his person on July 19, 2002.

As stated above, on April 14, 2003, United States District Judge Telesca denied Parker's motion to suppress based upon the recommendation of Magistrate Judge Bauer. (Docket # 32).  In so holding, Judge Telesca found that Simpson's initial pat frisk of Parker was authorized for purposes of officer safety.  Specifically, Judge Telesca found that, "[b]ased on Officer Simpson's viewing of the bulge in defendant's clothing, the information he received earlier that day that Parker may have been carrying a gun, Parker's similarity in size and dress to the suspect wanted in connection with the hit and run accident, and Simpson's knowledge that Parker had been involved in either using or selling drugs, (based on his previously arresting defendant for possession and distribution of drugs), . . . Officer Simpson had reasonable suspicion to believe that criminal activity was afoot, and properly investigated and searched the defendant."  (Docket # 32).  Moreover, Simpson's subsequent removal of the gun from the folds of Parker's sweatshirt was reasonable, Judge Telesca found, for the purpose of ensuring the safety of the police and bystanders.  *See Terry v. Ohio*, 392 U.S. 1, 9 (1968); *Elkins v. United States*, 364 U.S. 206, 222 (1960); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975).

Because I find that Parker's testimony was incredible and should not alter the legal analysis underlying the District Court's previous denial of Parker's suppression motion, it is my recommendation that the District Court again deny his motion.

## **CONCLUSION**

For the foregoing reasons, it is my decision that defendant's motion to reopen the suppression hearing to permit further cross-examination of Officer David Simpson **(Docket**

33

**# 106)** be **DENIED**.  In addition, it is my recommendation that defendant's motion to suppress tangible evidence seized from his person during a search at the Public Safety Building on May 1, 2002 **(Docket ## 90, 102)** be **DENIED;** that defendant's motion to suppress evidence seized following a traffic stop on June 7, 2002 **(Docket # 90)** be **DENIED**; and, that defendant's motion to suppress evidence seized on July 19, 2002 **(Docket # 90)** be **DENIED**.

        s/Marian W. Payson
                MARIAN W. PAYSON
                United States Magistrate Judge

Dated: Rochester, New York
        June   1  , 2005.

34

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York.[16]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2(a)(3) of the Local Rules of Criminal Procedure for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 58.2(a)(3) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

s/Marian W. Payson
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
June __1__, 2005.

---

[16] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(F) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the ten days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).